## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** ) | **NO. 4:20-CR-00065** |
| ) | **(JUDGE BRANN)** |
| vs. ) | |
| **LORENZO SCOTT,** ) | |
| Defendant. ) | |

### DEFENDANT SCOTT'S MOTION  FOR SPECIFIC DISCOVERY AND *BRADY* MATERIAL

**AND NOW,** comes Defendant, LORENZO SCOTT, by his attorneys James A. Swetz, Esq. and Thomas Thornton, Assistant Federal Public Defender, requesting this Court to enter an Order requiring the government to provide the defense the information and documents requested:

### INTRODUCTION

1.     On March 25, 2015, a correctional officer, while conducting a routine tour of G-block at the Special Management Unit ("SMU") at USP Lewisburg, found Lorenzo Scott stomping his cellmate Larry McCoullum's head and chest while McCoullum lay on the floor of their shared cell.

2.     After McCoullum was removed from the cell, Scott was questioned about what had happened and admitted he intended to kill his cellmate.

3.     McCoullum was unresponsive and transported to Geisinger Medical

Center by ambulance.

4.     McCoullum remained unresponsive throughout his hospital stay and was eventually transferred to FMC Butner on May 6, 2015.

5.     At Butner, McCoullum never responded to treatment and remained in a vegetative state until he died on May 21, 2017.

6.     McCoullum's cause of death was determined to be the blunt force head trauma he suffered when assaulted by Lorenzo Scott at USP Lewisburg on March 25, 2015.

7.     At the time of the assault at USP Lewisburg, Scott was serving a sentence from the United States District Court for the Northern District of Texas, for bank robbery and brandishing a firearm in relation to a crime of violence.

8.     According to information revealed by the government, Scott has a substantial mental health history while incarcerated in the Bureau of Prisons.

9.     On March 3, 2020, Lorenzo Scott was indicted and charged with the intentional, premeditated murder of Larry McCoullum.

10.    As a result of his indictment for intentional, premeditated murder, Scott faces the possibility of a death sentence should the case be authorized by the Attorney General of the United States for the death penalty.

## THE AUTHORIZATION PROCESS UNDER THE JUSTICE MANUAL

11.     In the Federal system, the process by which the government decides whether to seek the death penalty in each case is governed by a procedure (often referred to as the Death Penalty Protocol) outlined in Chapter 9-10.000 et seq. of the Justice Manual.

12.     The Death Penalty Protocol is designed to promote fairness, national consistency, adherence to statutory requirements, and law-enforcement objectives.

13.     Under the protocol, in deciding whether the death penalty should be pursued, the government may consider any legitimate law enforcement or prosecutorial reason that weighs for or against seeking the death penalty. These considerations may include, but are not limited to:

a)  The strength and nature of the evidence.
b)  The relative roles in the offense of defendants in jointly undertaken criminal activity.
c)  Whether the offense was intended to obstruct justice or was otherwise motivated by the victim's cooperation with law enforcement or the belief that the victim was cooperating with law enforcement.
d)  Whether the offense was committed to retaliate against a third-party for cooperating with law enforcement or against a third party believed to be cooperating with law enforcement.
e)  Whether the victim engaged in criminal activity that was a relevant circumstance of the offense.

3

    f)  Whether a defendant engaged in criminal activity for which he had not been held accountable.

    g)  Whether the defendant is already serving a substantial sentence such that an additional sentence of incarceration would have little punitive impact.

    h)  Whether the defendant has a history of infractions or offenses while incarcerated; and

    i)  Whether the defendant has accepted responsibility for his conduct as demonstrated by his willingness to plead guilty and accept a life or near-life sentence without the possibility of release.

14.    The protocol provides the decision to seek the death penalty requires an analysis of the applicable threshold intent factors under 18 U.S.C. § 3591, applicable statutory aggravating factors under 18 U.S.C. § 3592(b), and applicable mitigating factors 18 U.S.C. § 3592(a). The protocol specifically provides that no final decision to seek the death penalty should be made until defense counsel has been afforded an opportunity to present evidence and argument in mitigation.

**FUTURE DEAUTHORIZATION IS NOT A REMEDY FOR AN INCOMPLETE INVESTIGATION AND DEFICIENT PRESENTATION UNDER THE PROTOCOL EVEN WITH THE COMPLICATIONS OF THE COVID-19 PANDEMIC**

15.    Full development of mitigation evidence takes time and requires not only competent counsel but also a fully staffed defense team.  The ABA guidelines provide that the "defense team" comprise a minimum of two attorneys, one

4

investigator and one mitigation specialist. See Guideline 4.1, ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. ed. 2003), 31 Hofstra L. Rev. 913 (2003).

16.     The defense team  must collect, understand and analyze documentary and anecdotal information relevant to a client's life story, including "medical history; complete prenatal, pediatric and adult health information; exposure to harmful substances in utero and in the environment; substance abuse history; mental health history; history of maltreatment and neglect; trauma history; educational history; employment and training history; military experience; multi-generational family history, genetic disorders and vulnerabilities as well as multi-generational patterns of behavior; prior adult and juvenile correctional experience; religious, gender, sexual orientation, ethnic, racial, cultural and community influences; socio-economic, historical and political factors." (Guideline 5.1 Qualifications of the Defense Team ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, 10-7, Investigation, 31 Hofstra L. Rev. 913 (2003).

17.     The Department of Justice recognizes in its protocol and by practice that the defense mitigation investigation before presentation must be exhaustive

and thorough.

18.     Counsel cannot ignore the need to thoroughly investigate and present

a case expecting to seek deauthorization if the case were unexpectedly authorized.

The protocol simply does not allow counsel to make arguments against authorizing

the case for the death penalty and then, if an unfortunate authorization occurs, to

make the same arguments in favor of the deauthorization.

19.     According to §9-10.160 of the Justice Manual:

 "To the extent possible, the Capital Review Committee should include the
members who originally considered the case. Reviewers should evaluate the
withdrawal request under the principles used to make an initial
determination and limit the evaluation to determining if the changed facts
and circumstances, had they been known at the time of the initial
determination, would have resulted in a decision not to seek the death
penalty. ***For this reason, information or arguments that had been
advanced initially are not normally appropriate bases for withdrawal
requests***: In all cases, however, reviewers should consider all necessary
information to ensure every defendant is given the individualized
consideration needed for full review and appropriate decision-making."
(emphasis supplied).

20.     The Covid-19 pandemic has all but rendered defense investigation

impossible and has delayed presentations to the United States Attorney's office and

the Department of Justice under the protocol. These problems are not unique to the

Lorenzo Scott case but are simply a fact of pandemic life experienced by capital

defense teams and the government throughout the country as they attempt to do

what the protocol and capital case management require.

21.    In another filing, Scott has requested a delay in this Court's prior order that the parties consult and submit a case management order prior to March 1, 2021. The court has not acted on this motion but has scheduled a telephonic scheduling conference for March 19, 2021. [ECF 41; 47]

22.    Scott does not believe, based upon the restrictions imposed by the Covid-19 pandemic, the inability to travel, delays in obtaining necessary documents and in performing what a capital defense team would ordinarily perform in the absence of the pandemic, that the case is ready for a mitigation presentation to the Department of Justice under the Death Penalty Protocol. Although Counsel has begun using WebEX to confer with Lorenzo Scott at the Lackawanna County Jail where he is housed, a correctional officer is present in the room with Scott and the conferences are not confidential.

23.    For the reasons expressed in this motion, if the Court were to order the production of the documents already in the possession of the United States Attorney's office for the Middle District of Pennsylvania, the defense believes its ability to make a mitigation presentation under the protocol will be advanced and expedited to a greater degree than if the defense had to obtain the requested

documents, studies, and other requested information independently.

## USP LEWISBURG'S LONG AND NOTORIOUS HISTORY

24.     The SMU at USP Lewisburg has a long, notorious history. This history and the frequency of violence at the institution and how the conditions at the prison may have contributed to McCoullum's death will be central to any mitigation investigation and presentation.

25.     The SMU was created for "dangerously violent, confrontational, defiant, antagonistic inmates" according to the BOP. The aim of the SMU was to increase safety at other Federal prisons by housing the most problematic and putting them through a three (3) step rehabilitation program.

26.     At the time of Scott's' s offense, most Lewisburg prisoners were in a "double cell" solitary, housed with another prisoner in cells as small as 6' x 10' for almost 24 hours a day. The cells had originally been built for just one person but apparently, SMU inmates were doubled up to teach them to "successfully coexist"[1] and to alleviate overcrowding in BOP facilities.

---

[1]  "You have been assigned to the Special Management Unit (SMU) at the United States Penitentiary (USP), Lewisburg, Pennsylvania. The SMU is a multi-level program whose mission is to teach self-discipline, pro-social values, and the ability to successfully coexist with members of other geographical, cultural, and religious backgrounds. USP Lewisburg offers Levels I and II of the program, and most inmates transfer to another facility for Levels III and IV."
https://www.bop.gov/locations/institutions/lew/LEW_smu_aohandbook.pdf

27.     According to incident reports obtained by The Marshall Project and NPR, officers responded to 228 in cell fights and assaults with restraints or pepper spray in 2014 and 2015. At least 19 prisoners were treated for injuries such as a collapsed lung, a broken rib, multiple stab wounds, and head injuries. Since the SMU program opened, there have been more than 800 recorded prisoner on prisoner assaults a rate six (6) times higher than all federal prisons. And during that same period of time, at least four prisoners were killed by their cellmates.

https://www.prisonlegalnews.org/news/2017/apr/3/28-days-chains/; Inside Lewisburg Prison: A Choice Between A Violent Cellmate Or Shackles : NPR

28.     The conditions at Lewisburg were also described in a prison study by the District of Columbia Corrections Council.[2]  The Council inspected USP Lewisburg on April 10, 2014 and issued its report on November 5, 2015. Scott is charged with assaulting McCoullum on March 25, 2015.

29.     The study listed the following issues based upon interviews with inmates at USP Lewisburg which are relevant to this case:

- Inmate was put in a cell with a hostile inmate.

---

[2]https://cic.dc.gov/sites/default/files/dc/sites/cic/publication/attachments/Final%20USP%20Lewisburg%20Report%2011.5.15.pdf

- Inmate is concerned his cellmate will harm him.

- The only way you can get a change in cellmate is by fighting.

- There are constant inmate-on-inmate assaults or fights, several of which have resulted in deaths.

- Inmate was put in a cell with "people that are not programmed."

- Staff puts cellmates together to "fuck with you." If an inmate refuses a cellmate, there are problems, and inmates are shackled and punched with fists, threatened, and cursed at by staff.

- Inmate was assaulted by his cellmate. After the assault, he did not receive emergency care but was told to put in a request for a sick call. He suffered extensive injuries, required surgery, and still has complications. This inmate only received care three months after the assault.

- Inmates are forced to live with other violent and psychologically impaired inmates from other groups or gangs in cells that are extremely small and unsanitary. If inmates refuse to cell with another inmate, they are written up for refusing an order and threatened.

10

District of Columbia Corrections Council Study at p. 28.

30.     The study listed the following issues based upon interviews with

inmates at USP Lewisburg concerning mental health treatment and lack of

medication:

- Inmate has been denied necessary mental health care.

- Inmate diagnosed with bipolar disorder and depression was taken off his medications due to allegations that his cellmate was taking them.

- Inmate was on depression medication and was taken off for misuse. The misuse infraction was dismissed, but the medication was not restored.

- Inmate, with a history of mental illness, has written to Psychology Services on several different occasions about his mental health symptoms, but he has not been receiving his psychotropic medication. He says he is hopeless and experiences suicidal thoughts, loss of sleep, an inability to concentrate, sadness, and extreme frustration.

- Inmate with depression and a history of mental illness received prior mental health treatment in the FBOP system but was taken off of psychotropic medications at Lewisburg.

- Inmate suffers from several mental illnesses, but he has been taken off psychotropic medication and is not receiving any mental health treatment.

- Inmate was diagnosed with bipolar disorder, schizophrenia, ADHD, and depression. He was taken off medication and not put on anything else.

- A nurse said that the inmate refused to take his mental health medication, when he had not. This resulted in the inmate being taken off mental health medication. His mental state has become worse. He has exhausted the administrative remedy process to get back on his medication and still is not.

District of Columbia Corrections Council Study at p. 25.

## SCOTT'S PRIOR DISCOVERY REQUEST

31.     On July 13, 2020, counsel wrote the government and requested the production/preservation of certain records and documents counsel deemed material to the authorization process and the defense of Mr. Scott.

32.     Although the government has produced documents and information related to the criminal investigation and has provided copies of Mr. Scott's and Mr.

12

McCoullum's central files ("C Files") maintained by the BOP, the government has

not produced the following despite request:

a. All documents and communications referring or relating to incidents
of inmate-on-inmate assaults between cellmates in the Special
Management Unit at USP Lewisburg from March 2010 to present,
including but not limited to, any logs and/or reports identifying a list
of all inmates involved in inmate-on-inmate assaults, the extent of any
injuries sustained and any medical services provided.

b. Copies of Form 583, Report of Incident, prepared by USP Lewisburg
for the years 2005-15 for all inmate deaths at USP Lewisburg.

c. Copies of the Board of Inquiry Report or Regional Inquiry Team
(After Action Report) or Local Inquiry Team Report or any after
action report and summary report conducted at USP Lewisburg due to
this incident. Also, the local response should include the corrective
action plan to the recommendations; all documents, records, video
recordings, or working papers or personal records reviewed and
created by members of the Boards or Teams, to include electronic
material.

d. Copies of all Board of Inquiry Reports, Regional Inquiry Team
Reports, Local Inquiry Team Reports and local responses and
corrective action plans or recommendations for all incidents at USP
Lewisburg. Also, all documents, records, working papers or personal
records created by members of the Boards or Teams, to include
electronic material.

e. The information required by the Inmate Discipline Program Statement
5270.09, regarding the Data Collection Requirements Codes 100 and
101 to include the following:

    i.   Type of weapon

    ii.  Type of victim

    iii. Nature of injury

13

iv. Referral for prosecution

f. The average daily population of the USP Lewisburg for the years 2005-2015.

g. Copies of all Institution Character Profiles reports conducted regarding USP Lewisburg from 2005 to 2015.

h. Copies of all Prison Social Climate Surveys reports regarding USP Lewisburg, from 2005 to 2015.

33.     The letter also indicated many of the BOP documents the defense requested (except those specifically dealing with Messrs. Scott and McCoullum) were studies or documents complied in civil litigation filed by inmates either individually or in attempted class actions against Lewisburg's administrators and personnel.

## PRIOR LITIGATION IN THE MIDDLE DISTRICT OF PENNSYLVANIA CONCERNING THE SMU AT USP LEWISBURG AND ITS RELEVANCY TO THE AUTHORIZATION PROCESS

34.     There have been two federal civil actions filed in the Middle District of Pennsylvania concerning the conditions at USP Lewisburg relevant to the culture and condition of Lewisburg at the time of the homicide in this case. One case is *Richardson v. Bledsoe*, 3:11-cv-02266 and the other is *McCreary v. Federal Bureau of Prisons*, Case No. 1:17-cv-01011.

35.     The *Richardson* and *McCreary* cases involve issues relevant to whether the case against Lorenzo Scott should be authorized for the death penalty.

14

36.     According to information revealed by the government in discovery, both Lorenzo Scott and Larry McCoullum had a substantial mental health history, a substantial disciplinary history, and a history of problems with cellmates.

37.     Despite their respective histories, the BOP decided to house them together in a cell designed for one person at USP Lewisburg.

38.     The defense believes that this neglect and decision by the BOP was a contributing factor in the assault which took place on March 25, 2015.

39.     In the *Richardson* case, the plaintiffs alleged officials at USP Lewisburg frequently placed inmates in cells with hostile cellmates, unnecessarily increasing the risk of inmate-on-inmate violence and that if an inmate refused to accept a hostile cellmate, he would be placed in painful restraints as a form of punishment.

40.     In the *McCreary* case, the plaintiffs alleged:

a)     "Individuals suffering from serious mental illness who are not properly treated find it very challenging, if not impossible, to meet these milestones, and find themselves being cycled through the SMU program multiple times and frequently ending as 'SMU FAIL,'" "In practice, most men in the SMU program never receive any mental health evaluations, let

15

alone necessary follow-up mental health services."

b)      USP Lewisburg practiced "double-cell solitary confinement." The lawsuit claims this "creates a powder keg environment" that results in "frustration and anger" among prisoners due to double celling and "having to deal with another person's idiosyncrasies."

c)      The suit also alleges that "perfunctory interviews" to screen prisoners for mental illness result in inadequate determinations for SMU placement.

d)      Additionally, mental health treatment was reportedly lacking. "Private face-to-face mental health contacts do not occur at USP Lewisburg," the complaint states. Counseling sessions occur through the cell door in the presence of a guard and cellmate, "and within earshot of the men housed nearby." If a prisoner is removed from his cell, he has "short, five to ten minute conversations in the shower with psychological staff," according to the suit.

e)      Further, medication is often denied. "Men who were previously diagnosed with mental illness by the BOP and prescribed medication at other BOP facilities are routinely taken off their medication when they arrive at

USP Lewisburg.

     f)     When the mentally ill act out, they are subjected to 'four pointing,'" where they are restrained on a bunk by all four limbs. Often, their misconduct is related directly to their mental health problems."

     g)     "One of the named plaintiffs in the case, prisoner Richard C. Anamanya, "received multiple diagnoses of mental illness and other mental health concerns, both inside and outside prison. While at USP Lewisburg, his medication was discontinued without explanation and his only mental health "treatment" consisted of conversations at his cell door "and the receipt of 'packets' containing crossword puzzles and colorable cartoons.""

https://www.prisonlegalnews.org/news/2018/jan/31/lawsuit-alleges-inadequate-bop-mental-health-treatment-smu/

41.     During the *Richardson* and *McCreary* litigation, documents have been produced, interrogatories have been answered, and depositions have been taken concerning the issues of inmate-on-inmate violence, cellmate assaults, the culture and practices at USP Lewisburg, the assignment of unruly and mentally ill cellmates as a punitive measure, and the failure of the BOP to provide mental health treatment and medication to mentally ill inmates so sorely in need.

42.     These materials are within the custody and control of the Civil

Division of the United States Attorney's office for the Middle District of

Pennsylvania.

43.     These materials would be valuable in arguing this case should not be

authorized for the death penalty.

44.     Under the death penalty protocol, the Department of Justice considers

whether any legitimate law enforcement objective would be furthered by a death

authorization or weigh against a death authorization.

45.     In considering whether to authorize a case for the Federal death

penalty, the government must determine not only the likelihood of a conviction for

a death eligible defense but also the likelihood a jury will return a death verdict

after a penalty phase.

46.     Experience with the modern federal death penalty amply demonstrates

that capital jurors may consider the type of material sought herein—such as that

relating to Bureau of Prisons' prison conditions, BOP's negligence, violations of

policy, and other circumstances of the offense—to be mitigating factors that could

support the imposition of a sentence less than death. Federal courts have

consistently recognized, and capital juries have consistently found, that the

18

government's awareness of the potential for a person to commit violence, or the government's capacity to avert violence, is a mitigating circumstance of a capital offense. *See United States v. Christensen*, 2:17-cr-20037-JES-JEH (C.D. IL.) ECF 481 (Sentencing Verdict Form), at 14 (enumerating as mitigating factor that state university's counseling center did not treat or follow up with defendant, who sought mental health intervention for homicidal thoughts); *United States v. Candelario-Santana*, No. 09-427 (D.P.R.), ECF 1051 (Sentencing Verdict Form), at 11 (jurors wrote in that system "failed" defendant by not managing his incarceration or following up with him during probation); *United States v. McCluskey*, Cr. No. 10-2734 (D.N.M.), ECF 1481-1 (Sentencing Verdict Sheet), at 5-6 (failure department of corrections to properly supervise private contractor contributed to the occurrence of the offenses; failure of contractor to follow proper security policy contributed to the occurrence of the offenses; offenses would not have occurred had department of corrections properly supervised private contractor; offenses would not have occurred had contractor followed proper security policy); *United States v. Richardson*, 1:08-CR-139 (N.D. GA.), ECF 948 (Sentencing Verdict Sheet), at 11 (crime "never would have happened if BOP had paid proper attention to the cell assignments" of defendant and his cellmate or if

19

defendant "had been properly medicated prior to the offense"); *United States v.*
*Duong*, 5:01-cr-20154-JF-1 (N.D. CA.), ECF 1492 (Sentencing Verdict Sheet), at
9 (jurors wrote in "Early intervention by law enforcement could have prevented
later crimes."); *United States v. Snarr*, 1:09-CR-15 (E.D. TX.), ECF 349-1
(Sentencing Verdict Sheet), at 5-6 (BOP facility "lacked proper leadership[,]
staffing[, and] training"; "allowed the inmates to police themselves"; "failed to
follow proper SHU policies"; "failed to properly shackle or restrain" and "properly
escort" defendant; "failed to keep [defendant] separate from the other inmates;
"failure of the BOP employees to follow proper policies contributed to the
occurrence of the offense"; "offense would not have occurred if the BOP
Beaumont SHU facility had followed proper policies and procedures."); *United*
*States v. Garcia*, 1:09-CR-15 (E.D. TX.), ECF 350-1 (Sentencing Verdict Sheet),
at 9-10 (jury finds mitigating facts that BOP facility employees "habitually failed
to follow proper policies"; "failed to properly shackle", "to properly escort", and to
keep defendant "separate from other inmates"; failure of BOP employees "to
follow proper policies contributed to the occurrence of the offense" and the offense
"would not have occurred if the BOP facility had followed proper policies.");
*United States v. Sablan*, 00-CR-00531 (D. CO.), ECF 2959-8 at 16 (BOP placed

defendant in Special Housing Unit cell along with the co-defendant and victim despite the fact that the cell was designed to house only two people; circumstances that led to victim's death "existed, at least in part, because of failure(s) by BOP officials to properly do their job(s), by allowing alcohol and weapons in the cell"; jurors wrote in that "BOP didn't do their job by faulty logic of putting [co-defendants] in the same cell" and victim died "because the guards failed to do 30-minute rounds.").

47.     In five of these cases – *United States v. Candelario-Santana*, No. 09-427 (D.P.R.), *United States v. McCluskey*, Cr. No. 10-2734 (D.N.M.), *United States v. Duong*, 5:01-cr-20154-JF-1 (N.D. CA, and both Sablan defendants (William Concepcion Sablan and Rudy Sablan 00-CR-00531 (D. CO.)), the jury imposed life sentences after finding *inter alia*, that the government's conduct and institutional negligence before the homicides was a mitigating factor.

48.     If capital juries believe violations of BOP policy, overcrowding, the failure to provide mental health treatment to inmates, providing cellmates as a punitive measure, prison culture, inmate on inmate violence and assaults support a sentence less than death, the same information would be relevant to the Attorney General's decision whether a case should be authorized for the Federal death

penalty under the Death Penalty Protocol.

## DOCUMENTS AND INFORMATION TO BE PRODUCED

49.    The documents and information requested in this motion are under the custody and control of the government in the United States Attorney's Office for the Middle District of Pennsylvania and readily available for production to the defense in this case.

50.    The documents and information being requested in this motion are not subject to the delays and difficulties posed by Covid-19 restrictions, delays and protocols.

51.    The *Richardson* and *McCreary* discovery, based upon counsels' experience and knowledge of the practices in the United States Attorney's Office in the Middle District of Pennsylvania, should be in digital form and easily copied and furnished to the defense upon this Court ordering production.

52.    Additionally, if any of the BOP data and reports requested by the defense discovery and preservation letter were not produced in the *Richardson* and *McCreary* litigation, production of the information has become so routine in BOP capital litigation, counsel believes production would be at most a "key stroke away" once the Court issues a discovery order.

53.     It is expected that the documents and information being requested in this motion will expedite the presentation required of the defense to argue the government should not authorize this case for a potential Federal death penalty.

54.     As a result of the foregoing, the defense requests that the government produce the following:

a. All information the government produced to the plaintiffs in the *Richardson* and *McCreary* lawsuits, including but not limited to statements, studies, statistical compilations, policies, memoranda, writings of every kind, in response to a request for production of documents under the Federal Rules of Civil Procedure.

b. All answers made by the government to any interrogatory propounded by any of the plaintiffs in the *Richardson* and *McCreary* lawsuits.

c. All transcripts of any deposition taken by the government or the plaintiffs in the *Richardson* and *McCreary* lawsuits.

d. All documents and material obtained by the government from any of the plaintiffs in the *Richardson* and *McCreary* lawsuits whether obtained voluntarily or informally or following the government's, subpoena, request for production of documents or service of

23

interrogatories upon any plaintiff in the *Richardson* and *McCreary* lawsuits.

e. To the extent the information contained in ¶ 32 (a)-(h) of this motion was not produced to the plaintiffs in the *Richardson* and *McCreary* litigation, that the information be obtained by the government from BOP and delivered forthwith to the defense.

**WHEREFORE**, Defendant Lorenzo Scott, through counsel, requests this

Court to grant this motion and order the discovery requested herein.

Respectfully Submitted,

/s/JAMES A. SWETZ
James A. Swetz, Esq. (Pa. Attorney ID 23473)
Email Address: jaswetz@jaswetzlaw.com
2312 Wilton Drive, Ste 23
Wilton Manors, Fl. 33305
(Tel.) 954-800-6450
Attorney for Defendant Lorenzo Scott


/s/ THOMAS A. THORNTON
Thomas A. Thornton, Esquire
Assistant Federal Public Defender
Attorney ID# 44208
Federal Public Defender's Office
100 Chestnut Street, Suite 306
Harrisburg, PA  17101
Tel. No. 717-782-2237
Fax No. 717-782-3881
thomas_thornton@fd.org
Attorney for Lorenzo Scott

## CERTIFICATE OF SERVICE

I, James A. Swetz, Esq., do hereby certify that the foregoing **MOTION FOR SPECIFIC DISCOVERYAND *BRADY* MATERIAL** has been served electronically upon the government through the Court's ECF system.

Date: March 18, 2021                    */s/*JAMES A. SWETZ
                                        James A. Swetz, Esq. (Pa. ID 23473)

## CERTIFICATE OF CONCURRENCE/NON-CONCURRENCE

Prior to filing the instant motion, the undersigned forwarded a copy to Robert O'Hara, Assistant United States Attorney, to determine whether the government concurs in this motion. By email dated March 16, 2021, Mr. O'Hara indicated his nonconcurrence in the motion and the relief sought.

Date: March 18, 2021                    */s/*JAMES A. SWETZ
                                        James A. Swetz, Esq. (Pa. ID 23473)